# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

GENE LEONARD SMITH,

          Defendant.

No.  CR07-3038-LTS

**MEMORANDUM
OPINION AND ORDER**

## I.  INTRODUCTION

This case is before me on defendant Gene Leonard Smith's motions (Doc. No. 85, 92) for compassionate release.  The Government has filed a response (Doc. No. 94) and Smith has filed a reply (Doc. No. 97).  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.  BACKGROUND

On November 6, 2008, United States District Judge Mark W. Bennett sentenced Smith to life in prison on one count of conspiracy to distribute 500 grams or more of methamphetamine mixture following at least two felony drug convictions and using a minor to distribute methamphetamine mixture and 60 months on one count of possession of a firearm in furtherance of a drug trafficking crime, to be served consecutively to life in prison.[1]  *See* Doc. No. 58.  Smith's health has deteriorated during his incarceration.  In October 2017, Smith underwent a precautionary chest x-ray because of his history of asthma and chronic obstructive pulmonary disease (COPD).  Doc. No. 92-3 at 6.  The

---

[1] Judge Bennett was required to sentence Smith to life in prison due to Smith's previous felony drug convictions.  Doc. No. 64 at 9.

x-ray showed an 8-millimeter (mm) and 4 mm left upper lobe nodular density.[2] *Id.* In July 2018, Smith underwent a computerized tomography (CT) scan that showed a 15 mm left upper lobe nodule. *Id.* In January 2019, Smith underwent a positron emission tomography (PET) scan[3] that showed a left upper lobe mass with a standardized uptake value (SUV) of 7.6. *Id.* In July 2019, another CT scan showed a 1.9 centimeter (cm) left upper lobe lung nodule. *Id.*

In September 2019, two years after it was first noted on an x-ray, Smith was diagnosed with stage IIIA non-small cell lung cancer[4] that had spread to his lymph nodes. *Id.* at 1–5. That month he underwent wedge resection surgery in an attempt to remove cancerous lung tissue. *Id.* at 6. Smith had a post-surgery complication because he caught an infection with prolonged chest tube drainage. *Id.* In November 2019, Smith was transferred from FCC Petersburg to FMC Butner. *Id.* He had a consultation appointment with Dr. Andrews Carden on November 15, 2019. *Id.* at 6–7. The consultation report states that Dr. Carden planned to start Smith on chemotherapy and after completing chemotherapy to run another PET scan to evaluate Smith's response to therapy. *Id.* at

---

[2] A lung nodule is a round area that is more solid than normal lung tissue. Most nodules are not cancer, but for some individuals can be an early cancer. A CT scan is often used to determine whether a nodule is cancer. A nodule that grows larger over time is a sign that it could be cancer. Christopher G. Slatore, Renda Soylemez Winer and Amber D. Laing, *What is a Lung Nodule?*, 193 Am. J. Respir. Crit. Care Med. 11–12 (2016), https://www.thoracic.org/patients/patient-resources/resources/lung-nodules-online.pdf.

[3] A PET scan is an imaging test that helps reveal how an individual's tissues and organs are functioning. It uses a radioactive drug (tracer) to show this activity. PET scans are used to, among other things, detect cancer. Higher levels of radiotracer uptake in an area of the body often corresponds to areas of disease. *Positron Emission Tomography Scan*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/pet-scan/about/pac-20385078 (last visited May 14, 2020).

[4] In stage IIIA non-small cell lung cancer, the tumor is 5 cm or smaller and cancer has spread to lymph nodes. *Stage IIIA Non-Small Cell Lung Cancer*, National Cancer Institute, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/stage-iiia-non-small-cell-lung-cancer (last visited May 14, 2020).

2

7. The report also states that Dr. Carden informed Smith that, "[d]espite chemotherapy, the five-year overall survival rate is approximately 25% in stage III non-small cell lung cancer." *Id.* at 6.

On January 21, 2020, Smith finished chemotherapy treatment. *Id.* at 14. On February 4, 2020, another PET scan was conducted. Doc. No. 94-5. The accompanying report noted that there was "a focal 1.2 cm area of radiotracer uptake involving the left suprahilar region at the surgical site suspicious for residual/recurrent tumor at that site." *Id.* at 3. The report stated that there was probable radiotracer uptake in 1.2 cm of the right perihilar lymph node and neoplastic infiltration[5] was possible. *Id.* The report also found mild radiotracer uptake involving the bony structures in the lower thoracic and lumber spine region which could relate to posttreatment changes, but "metastatic disease [was] not entirely excluded." *Id.* Finally, the report noted radiotracer uptake involving the tongue base and the palatine tonsil regions which may have been physiologic or developing neoplastic infiltration. *Id.*

On February 13, 2020, Smith had a follow-up appointment for his lung cancer with a physician's assistant. Doc. No. 92-3 at 13–15. The appointment notes state that a plan for Smith's cancer going forward had not been discussed with oncology yet. *Id.* at 14. On February 21, 2020, Smith had another follow-up appointing regarding his lung cancer with Dr. Carden. *Id.* at 16–17. Dr. Carden's appointment notes state that Smith's February 2020 PET scan was "equivocal for residual disease" and Smith needed to be seen by a cardiothoracic surgeon for possible mediastinoscopy.[6] *Id.* at 16. Dr. Carden

---

[5] Neoplastic infiltration means that the cancer has spread beyond the layer of tissue in which it developed and is growing into surrounding, healthy tissues. *Infiltrating Cancer*, National Cancer Institute, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/infiltrating-cancer (last visited May 14, 2020).

[6] Mediastinoscopy is a procedure a doctor uses to look inside the mediastinum—the area behind the breastbone and between the lungs. It is often done to check for cancer or stage lung cancer. *Mediastinoscopy*, American Cancer Society, https://www.cancer.org/treatment/understanding-your-diagnosis/tests/endoscopy/mediastinoscopy.html (last visit May 21, 2020).

3

also put in a request for "urgent" cardiothoracic surgery with a target date of March 6, 2020, and wrote that the reason for the request was, "[s]tage IIIA non small cell lung cancer post-surgery and adjuvant chemo. PET scan is concerning for mediastinal disease. Please assess for mediastinoscopy for confirmation. Repeat PET scan ordered for 2 months." *Id.* at 17. On March 10, 2020, another medical provider wrote that Smith's lung cancer was in "advanced stages." *Id.* at 19. On March 16, 2020, an administrative note was added to Smith's medical file stating, "patient with lung cancer. He is being planned for further surgery. He has 3 appointments in place: PFT, CT [and] surgeon. Preanesthesia on 3/27/20." *Id.* at 21.

On March 27, 2020, Smith had an initial consultation with Dr. Matthew Hartwig, a cardiothoracic surgeon, at the Duke Cancer Center Thoracic Clinic. *Id.* at 29–38. Dr. Hartwig wrote that his evaluation of Smith "indicates he likely needs diagnoses of abnormal areas on PET scan; there are 2 areas in particular, in the left and right hilum." *Id.* at 37. He also wrote, "[w]e need to get images ASAP and then plan biopsy with either Dr. Hartwig or IP, depending on location of nodes." *Id.* at 38.

Smith also suffers from a number of health conditions other than lung cancer. Medical records indicate Smith has a history of morbid obesity, sleep apnea, hyperlipidemia, hypertension, anxiety, depression, antisocial personality and COPD. *Id.* at 6, 10. On February 13, 2020, he reported that he had to use his albuterol rescue inhaler two to three times daily because of shortness of breath with exertion while conducting daily living activities. *Id.* at 13. He also reported that he uses a CPAP machine for his sleep apnea every night but is fatigued every morning. *Id.*

Further, Smith has a long history of lower back pain and has undergone multiple back surgeries. *Id.* at 8. He was issued a wheelchair in early 2017 and has been seen using it at his medical appointments. *Id.* at 6, 8, 10, 14, 39. Medical records state that Smith is able to ambulate independently for only short distances and generally uses a walker or wheelchair for longer distances. *Id.* at 8.

4

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is extremely limited. One way a court may modify a sentence is through "compassionate release" as outlined in 18 U.S.C. § 3582(c)(1)(A), which was recently modified by the First Step Act of 2018 (FSA). *See* Pub. L. No. 115-391, § 603. In the past, 18 U.S.C. § 3582(c)(1)(A) permitted a court to reduce a defendant's term of imprisonment only upon the motion of the Director of Bureau of Prisons (BOP). The FSA modified § 3582(c)(1)(A) such that a defendant may now directly petition the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See Mohrbacher v. Ponce*, No. CV18-00513, 2019 WL 161727, at *1 (C.D. Cal. Jan. 10, 2019) (discussing modifications made to § 3582(c)(1)(A) by the FSA); *see also United States v. Perez-Asencio*, No. CR18-3611, 2019 WL 626175, at *2–3 (S.D. Cal. Feb. 14, 2019).

If a defendant fully exhausts administrative remedies, the court may, upon motion of the defendant, reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

18 U.S.C. § 3582(c)(1)(A). Smith does not meet the requirements of § 3582(c)(1)(A)(ii). He is under 70 years of age. *See* Doc. No. 59 at 2. Accordingly, Smith's only possible avenue for relief is § 3582(c)(1)(A)(i).

5

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing Commission. *See* U.S.S.G. § 1B1.13 (U.S. Sentencing Comm'n 2018); *see also United States v. Hall*, No. CR98-7, 2019 WL 6829951, at *3 (E.D. Ky. Dec. 13, 2019); *United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist in the following circumstances:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

This Guideline predates the FSA and has "not been amended to reflect that, under the FSA, a defendant may now move for compassionate release after exhausting administrative remedies." *Rivernider*, 2019 WL 3816671, at *2. Courts are split on whether the policy statement is binding because it predates the FSA's changes to 18 U.S.C. § 3582(c)(1)(A). A number of district courts have concluded that Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See, e.g., United States v. Rodriguez*, CR17-00021, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); *United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Brown*, No. CR05-00227, 2019 WL 4942051, at *4 (S.D. Iowa Oct. 8, 2019); *United States v. Fox*, CR14-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, CR13-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *United States v. Cantu*, No. CR05-458, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Other courts have concluded that extraordinary and compelling reasons exist only if they are included in the Guideline. *See, e.g., United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

As I have previously stated, I agree with those courts that have found that although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes. *See United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *see also Rodriguez*, 2019 WL 6311388, at *7 (Congress knew that the BOP rarely granted compassionate release requests prior to the FSA, and the purpose of the FSA is to increase the number of compassionate release requests granted by allowing defendants to file

7

motions in district courts directly even after the BOP denies their request); *Brown*, 2019 WL 4942051, at *3 (same).

## IV.    DISCUSSION

### A.    *Exhaustion of Administrative Remedies*

On October 16, 2019, Smith submitted an administrative request for compassionate release based on his cancer diagnosis and other health issues to the warden at FCC Petersburg, where he was imprisoned at the time. *See* Doc. No. 92-1 at 3–7. Before Smith received a response, he was transferred to FMC Butner. Doc. No. 92 at 4. On February 3, 2020, Smith submitted another administrative request to the warden at FMC Butner. Doc. No. 94-3. On February 13, 2020, Smith's request was denied by the warden at FMC Butner because Smith did "not meet the criteria under Terminal Medical Conditions." Doc. No. 92-1 at 8. On March 20, 2020, Smith appealed the warden's decision. *Id.* at 9. Smith argues that, at least as of May 5, 2020, his appeal has not been ruled on. Doc. No. 92 at 5. The Government contends that Smith's appeal was denied by the Regional Office of the BOP on April 8, 2020, and that Smith's appeal to the BOP Central Office submitted on April 16, 2020, is still pending. Doc. No. 94 at 6 n.3; Doc. No. 94-8 at 5. On March 27, 2020, Smith filed his pro se motion for compassionate release with this court. *See* Doc. No. 85. On May 5, 2020, Smith filed another motion for compassionate release through counsel. *See* Doc. No. 92.

The parties disagree whether Smith has properly exhausted his administrative remedies within the BOP. There is no dispute that Smith filed his present pro se motion for compassionate release (Doc. No. 85) more than 30 days after the warden at FMC Butner received Smith's administrative request as required by 18 U.S.C. § 3582(c)(1)(A).[7] However, the Government notes that Smith's request to the warden did

---

[7] The Government at one point argues that Smith did not properly exhaust administrative remedies because he did not file his pro se motion for compassionate release "within 30 days

not mention COVID-19. Doc. No. 94 at 6. The Government argues that to properly exhaust administrative remedies, Smith's administrative request must raise the same issues asserted in his motion for compassionate release. *Id.* at 10. The Government contends that the BOP must be allowed the opportunity to determine whether Smith is eligible for compassionate release in light of the COVID-19 pandemic. *Id.* The Government argues that I should not excuse Smith's failure to raise the COVID-19 pandemic in his request to his warden and I should deny his motion without prejudice for this reason. *Id.* at 12. Smith responds that he presents extraordinary and compelling reasons for compassionate release because of his serious medical issues; the COVID-19 pandemic is another issue that has arisen after Smith's administrative request was made. Doc. No. 97 at 3. Smith argues that the fact that his situation has gotten worse because of the pandemic does not mean that his motion should be denied and he should be required to start the administrative process over again. *Id.* at 3–4.

Section 3582(c)(1)(A) unambiguously instructs that a defendant can bring a motion for compassionate release in federal court only "after [he] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." I agree with the majority of courts to weigh in on this issue that the statutory text of § 3582(c)(1)(A) makes it clear that a court cannot entertain a compassionate release motion unless a defendant has exhausted administrative remedies—even in light of the COVID-19 pandemic. *See, e.g.*, *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. Apr. 2, 2020); *United States v. James*, 15-cr-255 (SRN), 2020 WL 1922568, at *3 (D. Minn. Apr. 21, 2020); *United States v. Jenkins*,

---

after his receipt of his filing the request with the Warden on February 3, 2020, or after the Warden's decision on February 13, 2020." Doc. No. 94 at 11. This argument is meritless. It completely misreads the language of 18 U.S.C. § 3582(c)(1)(A) and contradicts the Government's own admission, elsewhere in its brief, that a defendant properly exhausts administrative remedies if he files a motion "30 days after receipt of a request by the warden." *Id.* at 9 n.6.

No. 4:15-CR-3079, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020); *United States v. Boyles*, No. 18-20092-JAR, 2020 WL 1819887, at *2 (D. Kan. Apr. 10, 2020); *United States v. Aguila*, No. 2:16-cr-00046-TLN, 2020 WL 1812159, at *1 (E.D. Ca. Apr. 9, 2020); *United States v. Epstein*, No. 14-287 (FLW), 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020); *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2 (E.D. Mich. Apr. 9, 2020); *United States v. Holden*, No. 3:13-cr-00444-BR, 2020 WL 1673440, at *7 (D. Or. Apr. 6, 2020); *United States v. Woodson*, No. 18-cr-845 (PKC), 2020 WL 1673253, at *3 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, No. 18 Cr. 273 (LGS), 2020 WL 1674137, at *1 (S.D.N.Y. Apr. 6, 2020); *United States v. Johnson*, No. RDB-14-0441, 2020 WL 1663360, at *6 (D. Md. Apr. 3, 2020); *United States v. Carver*, No. 4:19-cr-06044-SMJ, 2020 WL 1604968, at *1 (E.D. Wash. Apr., 1, 2020); *United States v. Zywotko*, No. 2-19-cr-113-FtM-60NPM, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020). Most courts that hold otherwise waive the exhaustion requirement based on Second Circuit precedent. S*ee United States v. Colvin*, No. 3:19cr179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020); *Poulios v. United States*, No. 2:09-cr-109, 2020 WL 1922775, at *1 (E.D. Va. Apr. 21, 2020).

The Government argues that § 3582(c)(1)(A) is a jurisdictional requirement rather than a claim-processing rule. *See* Doc. No. 94 at 9. For reasons explained below, the outcome in this case is the same regardless of whether the requirement is a jurisdictional or claim-processing rule. *See United States v. Britton*, No. 18-cr-108-LM, 2020 WL 2404969, at *4 (D.N.H. May 12, 2020) ("Thus, the outcome would be the same under this statute whether the court categorized the exhaustion requirement as jurisdictional or a claim-processing rule."); *United States v. Miamen*, No. CR 18-130-1 WES, 2020 WL 1904490, at *2 (D.R.I. Apr. 17, 2020) (acknowledging circuit and district court split about whether § 3582(c) generally is jurisdictional, but finding that court need not reach the question because even if exhaustion requirement is non-jurisdictional result would be

the same); *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 WL 1821010, at *3 (D. Maine Apr. 10, 2020) (same).

The Government next argues that § 3582(c)(1)(A) requires Smith to refer to COVID-19 in his administrative request before he files a motion for compassionate release based on his medical conditions, or, in other words, that § 3582(c)(1)(A) contains an issue exhaustion requirement. Doc. No. 94 at 10. The few district courts that have addressed this issue disagree on whether a defendant must specifically mention the COVID-19 pandemic in a BOP administrative request for compassionate release. Courts answering in the affirmative have found that the BOP should be given an opportunity to address COVID-19's impact on the defendant. *See United States v. Valenta*, No. 15-161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020); *States v. Jenkins*, No. 4:15-CR-3079, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020); *United States v. Mogavero*, No. 2:15-cr-00074-JAD-NJK, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020). Other courts explain that such motions are based on health conditions raised in the administrative request, and the COVID-19 pandemic "merely accentuates [a] meritorious claims for release." *Miller v. United States*, No. 16-20222-1, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020); *United States v. Coker*, No. 3:14-CR-085, 2020 WL 1877800, at *3 (E.D. Tenn. Apr. 15, 2020). Another district court within the Eighth Circuit has found that "issue exhaustion is inappropriate because § 3582 contains no such requirement and BOP compassionate release requests are not adversarial proceedings." *United States v. Brown*, --- F. Supp. 3d ---, No. 4:05-CR-00227-1, 2020 WL 2091802, at *4 (S.D. Iowa Apr. 9, 2020) (citing *Sims v. Apfel*, 530 U.S. 103, 109 (2000) ("The desirability of a court imposed a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding.")).

Whether in a particular case an inmate may have failed to exhaust by not mentioning COVID-19 in a request to the warden is a question that can be saved for another case. In this case, Smith has clearly exhausted his administrative remedies.

11

Smith's request for compassionate release is based primarily on his cancer diagnosis, which, according to the medical records, gives him less than a 25 percent chance of surviving the next five years. Smith's motion is not primarily about COVID-19. Rather, COVID-19 is simply another factor that exacerbates his ongoing health concerns. Put another way, even without the ongoing COVID-19 pandemic, Smith's health conditions would still be a basis for him to request compassionate release. Indeed, Smith started the compassionate release process long before COVID-19 came into prominence, and perhaps, even before it came into existence. *See* Doc. No. 92-1 at 3–7 (Smith first submitted an administrative request for compassionate release on October 16, 2019).

The COVID-19 pandemic only increases the urgency of Smith's health conditions and potential health outcomes. In addition, this is not a scenario in which Smith should have foreseen the COVID-19 pandemic at the time he filed his administrative request. He filed that first request on October 16, 2019, and his second request on February 3, 2020, long before any lay person would have foreseen the impact COVID-19 pandemic. Asking him to restart his process because of the COVID-19 pandemic would be tantamount to telling inmates that they must restart the process each time their condition deteriorates. That, clearly, is not the purpose of the statute.[8]

The Government claims that the "BOP conducts an extensive assessment for [compassionate release requests]" and "the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement." Doc. No. 94 at 11. The record before me does not support this assertion. The warden's denial of Smith's compassionate release request gave no explanation for his decision, only stating that "it has been determined that you do not meet the criteria

---

[8] According to the Government's argument, I should not consider changes in Smith's health status after February 3, 2020, because he did not raise those issues in his February 3 request. However, that is a standard even the Government does not abide by. *See* Doc. No. 94 at 17 (The Government bases its argument against finding extraordinary and compelling reasons on medical records dated after Smith's administrative request and the warden's denial).

under Terminal Medical Conditions at this time." Doc. No. 92-1 at 8. Behind the scenes, the BOP asked Dr. Andres Carden if Smith meets the criteria for compassionate release and, if not, why. Doc. No. 94-6 at 7. Dr. Carden replied, "Unclear prognosis at this time. I recommend he re-applies in 3 months." *Id.* This hardly demonstrates that the BOP conducted an "extensive assessment" or a "diligent and thorough review" of Smith's medical conditions in considering his request.

Circumstances have changed since Smith initially filed his administrative request. The basis for Smith's request has not. I will not require Smith to submit another administrative request, a process that has already proven unavailing, simply because Smith's situation is now more concerning in light of COVID-19. Smith has exhausted his administrative remedies pursuant to § 3582(c)(1)(A) because he filed his pro se motion for compassionate release more than 30 days after he submitted an administrative request to his warden requesting compassionate release due to his health conditions.

**B.      *Extraordinary and Compelling Reasons***

Smith argues that extraordinary and compelling reasons exist because he has been diagnosed with stage IIIA non-small cell lung cancer that has spread to his lymph nodes. Doc. No. 92 at 7. He states that, even with treatment, the five-year overall survival rate of individuals with his type of cancer is approximately 25 percent. *Id.* He explains that BOP medical providers have described his cancer as being in "advanced stages." *Id.* at 8 (citing Doc. No. 92-3 at 19). In addition to cancer, Smith points to his other serious medical issues, all of which are COVID-19 comorbidities, and his back issue that has left him largely confined to a wheelchair. *Id.* He argues that this combination amounts to extraordinary and compelling reasons that justify his release. *Id.*

The Government argues, confusingly, that Smith's BOP medical records do not support his contention that he has lung cancer. Doc. No. 94 at 17. The Government claims that Smith is not terminally ill because he is "going through the process to determine if his lung cancer has returned." *Id.* The Government concedes that Smith's

13

lung cancer and other health issues, such as COPD, could make Smith more vulnerable to serious illness if he contracts COVID-19. *Id.* However, the Government argues that Smith has been tested for COVID-19 on March 27, 2019, and twice daily from April 30, 2020, through May 5, 2020. *Id.*

### 1. Smith's Health Conditions

Smith is presently suffering from a serious and advanced illness—stage IIIA non-small cell lung cancer. The Government's contention that the record does not demonstrate that Smith has lung cancer is baffling. Smith was diagnosed with stage IIIA non-small cell lung cancer in September 2019. Medical records, however, indicate that the BOP knew or should have known that Smith had signs of lung cancer that could have been addressed much sooner. A lung nodule was first discovered in October 2017. While most nodules are not cancerous, a CT scan in July 2018 showed that the nodule had grown, indicating that it could be cancerous. Nothing further was done until January 2019 when a PET scan indicated a mass in Smith's left lung that could be cancerous. Even after the PET scan, nothing was done until July 2019, when another CT scan showed that the lung nodule had grown even more. Nothing was done to address these concerning scans until September 2019, when Smith underwent wedge resection surgery. These scans indicate that BOP medical officials had reason to suspect Smith's cancer for two years prior to starting treatment.

In November 2019, Smith was told that he would undergo chemotherapy and would then undergo another PET scan to evaluate whether chemotherapy was successful. He was also told that despite chemotherapy, the five-year overall survival rate for patients with stage III non-small cell lung cancer is only 25 percent. The PET scan done after Smith completed chemotherapy did not bring good news. It indicated that his left lung was suspicious for a residual or recurrent tumor and that his cancer possibly spread to his right perihilar lymph nodes, bony structures in his lower thoracic and lumbar spine region and his tongue base and palatine tonsil regions. Dr. Carden wrote the scan was

14

"equivocal for disease" and requested that Smith undergo urgent cardiothoracic surgery because of Smith's "[s]tage IIIA non small cell lung cancer post surgery and adjuvant chemo." Doc. No. 92-3 at 16–17. After the PET scan, other medical providers wrote that Smith's lung cancer was in "advanced stages" and that he was "being planned for further surgery." *Id.* at 19, 21.

Smith's appointment with Dr. Hartwig at the Duke Medical Center likewise did not bring good news. Dr. Hartwig requested images "ASAP" and a biopsy because Smith needed "diagnoses of abnormal areas on PET scan." *Id.* at 37–38. It is unclear why the Government believes this record does not demonstrate that Smith presently has cancer. The Government may think that Smith was cured of his lung cancer after completing chemotherapy. However, that thought is not supported by the records—which the Government itself submitted with its brief. *See* Doc. Nos. 94-1 to 94-13. Rather, the medical records provided show that none of Smith's doctors found Smith to be cancer free after he completed chemotherapy. Smith's February 2020 PET scan and follow-up medical appointments demonstrate that this continues to be true.

I find that Smith's lung cancer, along with his other medical conditions, could constitute extraordinary and compelling reasons, even without considering the COVID-19 pandemic.[9] Smith suffers from stage IIIA non-small cell lung cancer. The five-year overall survival rate for patients with this disease is 25 percent. Moreover, Smith's medical records suggest that the BOP delayed in diagnosing and treating Smith by more than a year and that treatment thus far has been unsuccessful. The February 2020 PET scan, post-chemotherapy, indicates several areas of concern: his left lung was suspicious

---

[9] While the Guidelines do not constrain my determination of what constitutes extraordinary and compelling circumstances, if they did, Smith's situation fits within Guideline § 1B1.13 cmt. n.1(A)(ii). That Guideline provides that extraordinary and compelling reasons exist if a defendant is suffering from a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which she is not expected to recover.

for a residual or recurrent tumor, and his cancer has possibly spread to his right perihilar lymph nodes, bony structures in his lower thoracic and lumbar spine region and his tongue base and palatine tonsil regions. Even though Dr. Carden has written that this situation is "urgent" and other treatment notes indicate Smith's cancer is still present and has even spread, there is no indication in the record that the abnormalities in the PET scan have been diagnosed and treated.[10]

Besides cancer, Smith also suffers from a number of other serious health conditions, including chronic back pain that prevents him from ambulating independently for more than short distances. He must use a walker to ambulate long distances. He has been issued a wheelchair and is noted to have used it at medical appointments. He also suffers from COPD and reports needing to use his inhaler two or three times a day because of shortness of breath while conducting activities of daily living.

Other district courts have found extraordinary and compelling reasons in similar situations. *See United States v. Pesterfield*, No. CR14-00014, Doc. No. 756, at *3 (E.D. Tenn. May 6, 2019) (defendant had stage IIIB metastatic colorectal cancer that had spread to her lymph nodes); *Beck*, 2019 WL 2716505, at *1 (defendant had invasive metastatic breast cancer that had spread to her lymph nodes); *United States v. Wong Chi Fai*, No. CR93-1340, 2019 WL 3428504, at *1 (E.D.N.Y. July 30, 2019) (defendant had metastatic papillary thyroid cancer that obstructed his airway); *United States v. Gasich*, No. CR14-63, 2019 WL 4261614, at *1 (N.D. Ind. Sept. 9, 2019) (defendant had stage four metastatic breast cancer that had spread to her bones, lymph nodes, chest muscle, wall, and liver); *United States v. Gray*, 416 F. Supp. 3d 784, 789 (S.D. Ind. 2019) (defendant had liver cancer); *United States v. Spears*, No. CR98-0208, 2019 WL 5190877, at *1 (D. Ore. Oct. 15, 2019) (defendant had metastatic prostate cancer).

---

[10] On February 21, 2020, Dr. Carden wrote that Smith needed to undergo another PET scan in two months. Doc. No. 92-3 at 17. The record does not demonstrate that has happened yet. On March 27, 2020, Dr. Hartwig wrote that he needed to get images of Smith "ASAP" and plan a biopsy. *Id.* at 38. The record does not demonstrate that has happened yet either.

However, even though Smith's medical history could, alone, constitute an extraordinary and compelling reason to grant relief, I will consider the additional factor of the COVID-19 pandemic. As noted above, I am not required to restrain my review to the record as it existed when Smith filed his initial request but can consider subsequent developments.

### 2. *COVID-19 Pandemic*

The COVID-19 pandemic adds a greater urgency to the extraordinary and compelling reasons that already exist here. The Centers for Disease Control (CDC) lists nine categories of people who might be at higher risk from severe illness from COVID-19. CDC, *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 14, 2020). Smith is in at least three of those categories. Smith suffers from COPD, a chronic lung disease, is severely obese *and* has very recently undergone cancer treatment and is likely to need further treatment that leaves him immunocompromised.

First, Smith has chronic COPD. Doc. No. 92-3 at 15. One study has found that COPD is associated with a more than five-fold increased risk of severe COVID-19 infection.[11]

Second, Smith is severely obese. His most recent medical record indicates that he weighs approximately 314 pounds and is 6 feet tall. *Id.* at 33. This corresponds to a body mass index (BMI) of 42.6.[12] The CDC's website states that obesity corresponding

---

[11] Giuseppe Lippi and Brandon Michael Henry, *Chronic Obstructive Pulmonary Disease is Associated with Severe Coronavirus Disease 2019* (COVID-19), 167 Respiratory Medicine 105941 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7154502/pdf/main.pdf.

[12] *Adult BMI Calculator*, Centers for Disease Control, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited May 19, 2020).

to a BMI of 40 or higher makes one high-risk for severe illness from COVID-19.[13]  One
study has found that patients less than 60 years old with a BMI greater than 35 who are
infected with COVID-19 are two to three times more likely to be admitted to acute and
critical care than other patients in the same age category with lower BMIs.[14]

Third, Smith has recently undergone cancer treatment and medical records
demonstrate he is likely to need further treatment.  Cancer patients are more vulnerable
to serious illness from COVID-19 because cancer and cancer treatment depress the
immune system.[15]  Cancer patients who contract COVID-19 are nearly three times more
likely to die from the virus than the general population and patients with lung cancer are
likely even more vulnerable because of reduced lung function.[16]

Since the beginning of the COVID-19 pandemic, numerous courts have held that
a defendant's health conditions and the presence COVID-19 within BOP facilities
constitute extraordinary and compelling reasons for compassionate release.  *See, e.g.*,
*United States v. Lopez*, No. 18-CR-2846 MV, 2020 WL 2489746, at *3 (D.N.M. May
14, 2020) (defendant was 62 years old and suffering from high blood pressure and type
II diabetes); *United States v. Handy*, No. 3:10-cr-128-8 (RNC), 2020 WL 2487371, at
*1 (D. Conn. May 14, 2020) (defendant was 53 years old and suffering from congestive
heart failure, hypertension, obesity and chronic knee issues); *United States v. Ginsberg*,
No. 14 CR 462, 2020 WL 2494643, at *2 (N.D. Ill. May 14, 2020) (defendant was 56

---

[13] *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html
(last visited May 14, 2020).

[14] Jennifer Lighter et al, *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, Clinical Infectious Diseases (2020),
https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333.

[15] Laurie McGinley, *Patients with Certain Cancers are Nearly Three Times as Likely to Die of COVID-19, Study Says*, Washington Post (Apr. 28, 2020),
https://www.washingtonpost.com/health/2020/04/28/coronavirus-cancer-deathrates/.

[16] *Id*.

and had a history of cardiac and respiratory disease); *United States v. Gutman*, No. RDB-19-0069, 2020 WL 2467435, at *2 (D. Md. May 13, 2020) (defendant was 56 and suffering from multiple sclerosis and hypertension); *United States v. Rivernider*, No. 3:10-cr-222 (RNC), 2020 WL 2393959, at *1 (D. Conn. May 12, 2020) (defendant was 54 and suffering from diabetes, heart disease and hypertension); *United States v. Ullings*, No. 1:10-cr-00406, 2020 WL 2394096, at *1 (N.D. Ga. May 12, 2020) (defendant was 66 and suffering from hypertension and obesity); *United States v. Reddy*, No. 13-cr-20358, 2020 WL 2320093, at *1 (E.D. Mich. May 11, 2020) (defendant was 73 years old and suffering from type II diabetes, hypertension and orthopedic problems); *United States v. Foreman*, No. 3:19-cr-62 (VAB), 2020 WL 2315908, at *3 (D. Conn. May 11, 2020) (defendant was 58 years old and suffering from hypertension and obesity); *United States v. Simpson*, No. 11-cr-00832-SI-3, 2020 WL 2323055, at *1 (N.D. Cal. May 11, 2020) (defendant was 62 years old and suffering from asthma and diabetes); *United States v. Valencia*, No. 15 Cr. 163 (AT), 2020 WL 2319323, at *1 (S.D.N.Y. May 11, 2020) (defendant was suffering from heart disease, high blood pressure and epileptic seizures); *United States v. Joseph*, No. 18-cr-00350-BLF-1, 2020 WL 2315806, at *1 (N.D. Cal. May 8, 2020) (defendant was 60 years old and suffering from lung scarring resulting from coccidioidomycosis); *United States v. Pena*, No. 15-cr-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (defendant was 60 years old and suffering from hypertension and hyperlipdermia); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *4 (E.D. Mich. May 7, 2020) (defendant was 45 years old and suffering from type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea and asthma); *United States v. Diep Thi Vo*, No. 15-cr-00310-BLF-2, 2020 WL 2300101, at *3 (N.D. Cali. May 7, 2020) (defendant was 74 years old and suffering from hyperlipidemia, hypertension, vision issues and osteoarthritis); *Casey v. United States*, No. 4:18-cr-4, 2020 WL 2297184, at * (E.D. Va. May 6, 2020) (defendant was 76 years old and suffering from serious cardiac issues); *United States v. Howard*, 4:15-CR-00018-BR, 2020 WL 2200855, at *3 (E.D.N.C. May 6, 2020) (defendant was 52 years old and

19

suffering from COPD, type II diabetes, obesity, stage 3 kidney disease, edema and a diaphragmatic hernia); *United States v. Quintero*, No. 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (defendant was suffering from diabetes, a compromised immune system, obesity and hypertension); *United States v. Saad*, No. 16-20197, 2020 WL 2251808, at *5 (E.D. Mich. May 5, 2020) (defendant was 71 years old and suffering from chronic kidney disease, hypertension, pulmonary hypertension, sleep apnea and shingles); *United States v. Reid*, No. 17-cr-00175-CRB-2, 2020 WL 2128855, at *1 (N.D. Cali. May 5, 2020) (defendant was 71 years old and suffering from Valley Fever, hypertension and high cholesterol and is a prostate cancer survivor); *United States v. McCarthy*, No. 3:92-CR-0230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (defendant was 65 years old and suffering from asthma and COPD).

While the BOP has taken measures to prevent the transmission of COVID-19 among its inmate population,[17] it has nonetheless spread through many BOP facilities. The BOP reported on May 1, 2020, that it had tested 2,700 out of the 146,000 inmates within the BOP system for COVID-19, with 70 percent of those tested being positive.[18] As of May 27, 2020, 5 inmates and 10 staff members had tested positive for COVID-19 at Smith's facility, FMC Butner.[19] On the same BOP campus, 161 inmates and 10 staff members at Butner Low FCI, along with 1 inmate at Butner Medium II FCI and 231

---

[17] According to the BOP's website, it has taken many steps to protect inmates from exposure, including limiting inmate movement within each facility and between facilities, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms and modifying operations to maximum social distancing to the extent possible. *BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 11, 2020).

[18] Bureau of Prisons, Twitter, (May 1, 2020, 8:03 AM), https://twitter.com/OfficialFBOP/status/1256207531820662785.

[19] COVID-19 Cases, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 28, 2020).

inmates and 27 staff members at Butner Medium I FCI, have tested positive.[20]  Without a doubt, COVID-19 is present at Butner FMC and the larger Butner Federal Correctional Complex.

In arguing that the COVID-19 pandemic and Smith's health conditions do not constitute extraordinary and compelling reasons, the Government asserts that Smith "has been tested for COVID-19 on March 27, 2019, and twice daily from April 30, 2020, through May 5, 2020."  Doc. No. 94 at 17.  This is simply false, as Smith was screened for symptoms, not "tested," on these dates.  Doc. No. 94-9 at 13; Doc. No. 94-10 at 3–4.  In any event, given the presence of COVID-19 at FMC Butner, and the larger Butner campus, Smith is at risk of contracting the virus at any point after he tests negative.  While Smith's lung cancer and other health conditions, standing alone, constitute extraordinary and compelling reasons, the COVID-19 pandemic makes Smith's situation even more extraordinary and compelling.

### C.   *Section 3553(a) Factors and Danger to Community*

Whether Smith is a danger to the community and whether the § 3553(a) factors support Smith's release are the most challenging questions in this case.  Guideline § 1B1.13(2) provides that compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]"  Section § 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before granting a motion for compassionate release.  Section 3553(a) requires that I consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—

---

[20]  *Id.*  Butner Medium I FCI houses 883 inmates, meaning 26 percent of its population has tested positive for COVID-19.  *See FCI Butner Medium I*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/but/ (last visited May 21, 2020).

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . .;]

(5) any pertinent policy statement [issued by the Sentencing Commission . . .']

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Smith acknowledges that his present offense is very serious. Doc. No. 92 at 6. However, he argues that he has been incarcerated for approximately 154 months and this demonstrates the seriousness of his offense given his present health conditions.[21] *Id.* He contends that he is no longer a danger to the community because of his health conditions. *Id.* Smith states that if he were released, he has family who will support him and assist him in obtaining housing. *Id.* at 9.

The Government argues that Smith would be a danger to the community if he were released. Doc. No. 94 at 18. The Government argues that Smith was a significant drug dealer who dealt for years, and also possessed and used firearms during the drug

---

[21] Because Smith is currently serving a sentence of "life" there is not an official BOP good time credit calculation available. Considering the formula in 18 U.S.C. § 3624(b) and the length of his incarceration to date, if the BOP were calculating a potential release date for Smith, he may be eligible for between zero and 700 days of good time credit.

22

conspiracy for protection and to threaten others. *Id.* The Government points to Smith's criminal history, which includes violence. *Id.* The Government argues that the factors against compassionate release outweigh Smith's medical concerns related to COVID-19. *Id.* The Government also claims that Smith has not established that he would be less vulnerable to exposure to COVID-19 if he were released. *Id.*

Considering the § 3553(a) factors, the nature and circumstances of the instant offense and Smith's criminal history are undoubtedly serious and weigh against granting compassionate release. As to the present offense, Smith participated in a conspiracy to distribute methamphetamine. Doc. No. 59 at ¶ 28. During the course of the conspiracy, Smith used a minor to "middle" many methamphetamine transactions. *Id.* at ¶¶ 17. Smith directed the minor to have sex with some individuals to pay for drugs or pay off drug debts. *Id.* Smith possessed a firearm and used it to threaten others during the conspiracy. *Id.* at ¶¶ 22, 25, 26. Smith led law enforcement officers on a high-speed chase through Fort Dodge, Iowa. *Id.* at ¶ 13. Smith also has a lengthy criminal history, including some violence. *Id.* at ¶ 48–60.

Judge Bennett could not consider the Section 3553(a) factors at Smith's sentencing because of the mandatory minimum of life in prison. If he had been permitted to consider those factors, it appears that he would have imposed a sentence less than life in prison. At sentencing, Judge Bennett said:

> It's always a shame and a waste, almost always, when I have to impose a life sentence. It certainly is in this case because his guideline range is so much lower.[22] And many members of the federal judiciary are opposed to mandatory minimums, and I include myself in that. And this is just another example of what I think results in an injustice. . . .
>
> I'm not making any findings under Title 18, 3553(a) because it does not come into play. 3553(a) requires that I make a finding that the sentence is sufficient but not greater than necessary. Obviously in this case I think the sentence is greater than necessary, but the mandatory minimum trumps the factors in Title 18, 3553(a).

---

[22] Smith's advisory guideline range was 262 to 327 months. Doc. No. 59-2 at 3.

Doc. No. 64 at 9.

Additionally, while in no way dispositive, it is worth noting that if Smith were sentenced today, his mandatory minimum would no longer be life in prison. Under the FSA, the 21 U.S.C. § 851 enhanced penalties for Class A drug felonies were amended from life to 25 years for defendants who have had two or more prior qualifying serious drug offenses, and amended from 20 years to 15 years for defendants who have had one prior qualifying drug offense. Pub. L. No. 115-391, § 401(a)(2)(A), 132 Stat. 5194, 5220. The FSA also amended the definition of a "serious drug offense." *Id.* § 401(a)(1). Under the new definition, at least one, perhaps two, of Smith's three prior drug offenses would no longer meet the definition of a serious drug offense.[23] Doc. No. 59 at ¶¶ 54, 58, 59. With only two prior drug offenses, Smith would have been subject to a 25-year mandatory minimum on his drug charge and a 5-year mandatory minimum on his gun charge. With only one prior drug offense, Smith would have been subject to a 15-year mandatory minimum on the drug charge and a 5-year mandatory minimum on his gun charge.[24]

The remaining § 3553(a) factors outweigh the seriousness of the present offense and Smith's criminal history. Smith's most relevant personal characteristic is his poor health and vulnerability to COVID-19, and that weighs heavily in favor of release. Smith has been diagnosed with stage IIIA non-small cell lung cancer and his mobility is extremely limited because of back pain. He has served much of his sentence while battling his health problems and experiencing significant pain. This means that his sentence has been significantly more laborious than that served by most inmates. *See*

---

[23] Smith's 2004 drug conviction in Santa Clara, California, does not meet the definition of a serious drug offense under the current law. Doc. No. 59 at ¶ 58. I do not have sufficient information to determine whether the 1990 drug conviction from Wright County, Iowa, meets the current definition of a serious drug offense. *Id.* at ¶ 54. Smith's 1995 federal drug conviction does. *Id.* at ¶ 59.

[24] There would be a corresponding reduction in his guidelines range but calculating that reduction is too speculative at this juncture.

24

*United States v. McGraw*, No. CR02-00018, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019); *Beck*, 2019 WL 2716505, at *11; *United States v. Gray*, No. CR02-00018, 2019 WL 4572816, at *5 (S.D. Ind. Sept. 20, 2019).

Smith has been incarcerated for approximately 154 months. His difficult incarceration, his health-related physical limitations and the continued restrictions on his freedom through the use of supervised release, together, satisfy the goal of imposing sufficient punishment. In addition, releasing Smith under these unusual circumstances— his poor health and the COVID-19 pandemic—will not undermine the goal of deterrence. Smith's release will also not produce an unwarranted sentencing disparity because it accounts for his unique medical circumstances.[25]

Releasing Smith to home confinement will not subject the public to risk. In Smith's current state, his ability to be a threat is significantly diminished. In addition, Smith's criminal history corresponds to periods of his life when he was a methamphetamine user. Smith used methamphetamine from 1988 to 1995, when he was incarcerated for a prior federal drug offense. Doc. No. 59 at ¶ 59, 79. Most of Smith's criminal history occurred during this timeframe. *Id*. at ¶¶ 48–59. While on supervised released from 2001 to 2005, Smith reported that he did not use methamphetamine and he never failed a random urinalysis test. *Id*. at ¶¶ 79, 84. However, he was convicted of operating while intoxicated during his period of supervised release. *Id*. at ¶ 60. Smith began to use methamphetamine again in 2006, which is also when the conduct underlying the instant offense started. *Id*. at ¶ 79. Smith will be subject to supervised release and his record demonstrates that he is amenable to supervision. This reduces whatever risk he may otherwise pose to the public. *See Schmitt*, 2020 WL 96904, at *5.

---

[25] Additionally, as noted above, individuals with Smith's history are no longer subject to the same sentencing requirements he was, and similarly situated individuals from the era of his conviction have the same opportunity to move for compassionate release if they find themselves in the same health situation.

The applicable Section 3553(a) factors discussed above, and in relation to Smith's potential danger to the community, support compassionate release. Granting Smith's motion for compassionate release, in light of the 154 months he has already served, will still reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, afford adequate deterrence to criminal conduct and protect the public from further crimes. After considering all of the applicable factors, I find that Smith is eligible for compassionate release and will therefore grant his motion and impose a ten-year term of supervised release.

## V. CONCLUSION

For the foregoing reasons:

1.    Defendant Gene Leonard Smith's motions (Doc. No. 85, 92) for compassionate release are **granted**.

2.    Smith's term of imprisonment is hereby **reduced** to **time served**, subject to the following paragraph.

3.    Execution of this order is **stayed** for twenty-one (21) days to allow the Bureau of Prisons and United States Probation an opportunity to make the necessary arrangements for Smith's release.

4.    Upon release from BOP custody, Smith will be on supervised release for a term of **ten years**.

5.    An amended judgment will be entered separately to reflect the amended sentence and to set forth all conditions of supervision that will apply to Smith.

6.    The Clerk of Court shall provide a copy of this order to the Probation Office and the institution where Smith is incarcerated.

**IT IS SO ORDERED.**

**DATED** this 1st day of June, 2020.

_____

Leonard T. Strand, Chief Judge